IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>)<br>v. )<br>)<br>ROBERT EARL NOBLE, )<br>)<br>) | Criminal No. 06-10 Erie<br>District Judge McLaughlin |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Presently pending before the Court is a Motion to Suppress filed by Defendant, Robert Earl Noble. An evidentiary hearing on the motion was held on June 14, 2007.

On February 14, 2006, a federal grand jury returned a two-count indictment against Defendant for possession of a firearm by a convicted felon in violation of 18 U.S.C. Section 922(g)(1), and for making counterfeit obligations or securities in violation of 18 U.S.C. Section 471. Evidence supporting both charges was found during a search of Defendant's residence on October 18, 2005. The Defendant contends that neither his arrest at his home or subsequent search thereof was supported by reasonable suspicion.

In the instant motion, Defendant seeks to suppress the evidence recovered during the search of his residence because he contends it was based upon a stale tip from an unreliable informant. He further contends that his statements to law enforcement officers following the search should be suppressed as fruits of the unlawful search.

**A.     Findings of Fact**

The following constitute the Court's findings of fact.

1) Parole Agent David Divell, who had over 33 years experience as a parole agent for the Pennsylvania State Parole Board, testified that he began supervising Defendant in January, 2005. At that time, he was aware that Defendant had prior convictions related to drugs and assaultive behavior. (Hearing on Defendant's Motion to Suppress, Transcript, p. 16-17).

2) Various conditions of parole were imposed on Defendant as a result of the his parolee status, including the following:

- You shall not possess pagers, cell phones, or drug paraphernalia - - mandatory.

- You shall not operate a motor vehicle without a valid Pennsylvania driver's license, proof of insurance, vehicle registration and supervising agent's prior written permission.

(Transcript, p. 18; Government's Exhibit 2). In addition, Agent Divell also imposed special curfew restrictions on Defendant. Defendant assented to these conditions and signed the parole agreement. (Id).

3) On February 25, 2005, Defendant was given a written warning based upon a failure to report his employment change and to attend required reentry program appointments. (Transcript, p. 20).

4) On March 7, 2005, an administrative conference was held with Defendant at which time he was issued a warning for traveling to Cleveland, Ohio without permission and for operating a motor vehicle there and back without a valid operator's license. (Transcript, pp. 20-21).

5) On September 8, 2005, Defendant reported to Agent Divell that, although Defendant had been charged for driving without a license, it was, in fact, his brother who had been operating the vehicle and had given the police Defendant's name. At that meeting, Agent Divell instructed Defendant to go to the Erie Police Department with his brother and inform them that Defendant had not been the person driving the motor vehicle. (Transcript, pp. 21-22).

6) On September 12, 2005, Defendant informed Agent Divell that, pursuant to the previous conversation, he and his brother had in fact gone to the Erie police and cleared the matter up. Defendant further advised that his brother was to be charged with giving a false statement to law enforcement authorities. (Transcript, p. 22).

7) On October 16, 2005, Agent Divell received a telephone call from Almira Johnson, Defendant's ex- girlfriend, who advised Agent Divell that she and Defendant had broken up in August and that Defendant had been stalking and harassing her ever since. She further informed Agent Divell that Defendant had come to her residence at two o'clock A.M. on October 16, 2005, and had attempted to pick a fight. (Transcript, pp. 23-24).

8) On October 17, 2005, Agent Divell met with Defendant and advised him of Ms. Johnson's accusations. Defendant admitted to being at her residence but denied that he had been stalking or harassing her. As a result of Ms. Johnson's complaint, Defendant was advised by Agent Divell that he was to have no further contact with Ms. Johnson. (Transcript, pp. 24-25). This additional special condition of parole was memorialized and signed by Defendant on October 17, 2005. (Government's Exhibit 5, Special Conditions of Parole). Defendant was also issued a written warning for violating his curfew condition. (Transcript, p.25).

9) Later in the day on October 17, 2005, Ms. Johnson again appeared at Agent Divell's office. She informed him at that meeting that, in August, 2005, she had observed Defendant at his residence with a handgun in his possession. She further informed Agent Divell that Defendant had a cell phone in his possession and that she had seen Defendant with various types of drugs, but mostly marijuana. (Transcript, pp. 25-27). In that same conversation, she informed Agent Divell that the handgun and drugs were "usually" kept at his mother's home and that they would "probably" be there. (Transcript, pp. 47-52). She also informed him, however, that both the gun and the drugs

would periodically move between the defendant's residence and his mother's residence in the "kids' backpacks" because he was afraid of them being found in a drug search. (Transcript, p. 65).

10) During the course of Ms. Johnson's meeting with Agent Divell, she also informed him that Defendant had stolen her 1993 Cadillac, would not give it back, and was driving without a license. She also informed Agent Divell that she had seen Defendant drive without a license on numerous occasions. (Transcript, pp. 27-28, 56-57).

11) On October 17, 2005, Agent Divell and Parole Agent Gerald Verga were performing surveillance at the Defendant's residence in an attempt to observe Defendant committing the parole violation of operating a vehicle without a license. At that time, Defendant was observed getting into a Cadillac. When Defendant observed the parole agents' vehicle, he got out of the Cadillac without operating it. (Transcript, pp. 29-30).

12) The following morning, October 18, 2005, Agents Divell and Verga returned to the immediate area near the Defendant's house. While there, Agent Divell confirmed through a telephone call to the Erie Police Department that Defendant had been issued traffic citations for driving under suspension on August 10, 2005 and August 28, 2005. (Transcript, pp. 31, 36-37). During the course of that same conversation, he was advised that one of the citations would shortly be the subject of a hearing in traffic court. In addition to having obtained information that Defendant had two active citations pending for driving without a license, Agent Divell also contacted the Department of Motor Vehicles and requested registration information on two Cadillacs located in the vicinity of the Defendant's home. One Cadillac was purportedly registered with the Defendant's sister and himself, and the other with his sister only. (Transcript, p. 34-35, 72). At that time, Agent Divell called his supervisor and received permission to arrest Defendant for the technical parole violations of driving under suspension and without a license.

13) Agent Divell, Agent Verga, and two city of Erie police officers thereafter approached the residence. Ms. Allen, the Defendant's girlfriend at that time, let them in. (Transcript, pp. 37-38).

14) Upon entering the living room, Agent Divell observed Defendant sitting on a couch. Immediately in front of him on a coffee table were two cell phones. At that time, the Defendant was placed under arrest for the technical parole violations of driving without a license and possession of a cell phone. (Transcript, pp 38-39).

15) Immediately thereafter, Agent Verga noticed what appeared to be counterfeit currency in plain view in a trash can within a few feet of the Defendant. (Transcript, pp. 39, 75-77). Agent Divell described the counterfeit currency as "hanging out the side of the trash can" and indicated that it appeared to be copies of currency. (Transcript, pp. 60). Also at that time, Officer McGill of the Erie Police Department identified the Defendant as the person he had arrested for driving without a license. (Transcript, p. 39).

16) Subsequent to the discovery of what appeared to be counterfeit currency in the waste paper basket, Agents Divell and Verga searched the Defendant's bedroom. Upon looking under the Defendant's bed, Agent Divell retrieved a shoebox which contained a handgun. (Transcript, p. 40-41).

17) Agent Gerald Verga, a 12 year veteran Pennsylvania state parole agent, also testified and his testimony was in all material respects confirmatory of Agent Divell's.

18) On October 18, 2005, Agent Divell asked Agent Verga if he would be available to assist him in the apprehension of the Defendant. Agent Verga was made aware of the allegations of possession of a firearm and drug trafficking. (Transcript, pp. 67-69).

19) Agent Verga was informed by Agent Divell that, per the Erie Police Department, Defendant had two violations pending for driving without a license. (Transcript, pp. 71-72).

20) Prior to entering the residence, a backup from the Erie Police Department was requested for security purposes. Upon entering the residence, Agent Verga observed a couple of cell phones on a coffee table directly in front of the couch upon which Defendant was seated. (Transcript, pp. 74-75).

21) In addition, Agent Verga observed immediately adjacent to the couch what appeared to be twenty dollar counterfeit bills piled high in a waste paper basket. (Transcript, pp. 75-77).

22) After the Defendant was placed under arrest, Agents Verga and Divell conducted a search of the residence during which a handgun was recovered from the shoebox under Defendant's bed. (Transcript, pp. 77-78).

### B.     Conclusions of Law

1) Where a defendant files a motion to suppress challenging a warrantless search or seizure, the government carries the burden of justifying the agents' actions. United States v. Finefrock, 668 F.2d 1168, 1170 (10th Cir. 1982) (citing Chimel v. California, 395 U.S. 752 (1969)).

2) The Third Circuit concluded in U.S. v. Baker, 221 F.3d 438, 440 (3rd Cir. 2000), that "as a matter of Pennsylvania law, the standard consent to search form implies a requirement that parole officers have reasonable suspicion in order to conduct a search of a parolee . . .".

3) To ascertain whether "reasonable suspicion" exists to justify a search of a parolee, courts must consider "the totality of the circumstances to determine whether the 'officer has a particularized and objective basis for suspecting legal wrongdoing.' " U.S. v. Williams, 417 F.3d 373, 376 (3rd Cir.2005) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotations omitted)).

4) "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an

intrusion on the probationer's significantly diminished privacy interests is reasonable." United States v. Knights, 534 U.S. 112, 121 (2001) (noting that the reasonable-suspicion standard is less demanding than the probable-cause standard).

     5) At the hearing, Defense counsel suggested for the first time that there was not reasonable suspicion to effectuate the actual arrest. We reject this claim. At the time of the arrest, Agents Divell and Verga had confirmed with representatives from the Erie Police Department that the Defendant in fact had two traffic violations pending and that a hearing date had been set in traffic court. Moreover, Agent Divell knew that this Defendant had a history of operating vehicles without a license as evidenced by his trip to Ohio in March, 2005, as well as the reports by Ms. Johnson of driving without a license.

     6) We also find as a matter of law, having considered the totality of the circumstances, that the agents had a "particularized and objective basis for suspecting legal wrongdoing," Williams, 417 F.3d at 376, such that the search of the premises was supported by reasonable suspicion.

     7) Once validly inside Defendant's residence, the parole agents observed, in plain view, evidence of other parole violations which included cell phones and counterfeit currency in the waste paper basket.

     8) This plain view evidence *alone* was sufficient to justify the subsequent search of Defendant's residence. "Where a parole officer has discovered a parole violation and reasonably believes that a parolee may have committed further violations, parole officers are 'duty-bound' to investigate. See United States v. Henry, 472 F.Supp.2d 649, 654 (E.D. Pa. 2007) (citing United States v. Hill, 967 F.2d 902 (3d Cir.1992)).

     9) In addition, the agents had been informed that Defendant had possessed drugs and a gun as recently as August, 2005, which moved intermittently between his residence and his mother's.

10) We reject Defendant's contention that Ms Johnson's report concerning the drugs and gun was stale. See, e.g., United States v. Harvey, 2 F.3d 1318, 1321 (3rd Cir. 1993) (holding that, in a child pornography case, information between 13 to 15 months old was not stale); United States v. McCall, 740 F.2d 1331, 1337 (4th Cir. 1984) (information supporting search of defendant's new residence for stolen gun not stale where defendant had displayed gun in former residence, seven to nine months before warrant); United States v. Humphrey, 140 F.3d 762, 764 (8th Cir. 1998) (six month old information not stale).

11) We also reject Defendant's contention that Ms. Johnson's report lacked sufficient indicia of reliability. In this regard, prior to the search, Ms. Johnson's credibility was circumstantially buttressed in several ways. The agents corroborated her contention that Defendant had been driving without a valid license. Agent Divell had also corroborated Ms. Johnson's claim that Defendant had been at her residence after curfew on October 16, 2005. The presence of cell phones on the coffee table was also consistent with a prior report of Ms. Johnson. Finally, the agents were aware that Defendant had previously been convicted of assault and a drug-related offense.

12) Ms. Johnson's information, therefore, provided additional evidence supportive of the warrantless search based on reasonable suspicion.

**C.     Conclusion**

For the foregoing reasons, Defendant's Motion to Suppress is hereby DENIED.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 06-10 Erie |
| | ) | District Judge McLaughlin |
| ROBERT EARL NOBLE, | ) | |
| | ) | |

**ORDER**

AND NOW, to wit, this 26th day of July, 2007, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant Robert Earl Noble's Motion [Doc. No. 49] to Suppress is DENIED.

          **/s/ Sean J. McLaughlin**
          Sean J. McLaughlin
          United States District Judge

cm: All parties of record. ____